135 U.S. 167 (1890)
MACKALL
v.
MACKALL.
No. 159.
Supreme Court of United States.
Argued April 1, 2, 1890.
Decided April 21, 1890.
APPEAL FROM THE SUPREME COURT OF THE DISTRICT OF COLUMBIA.
*168 Mr. S.S. Henkle (with whom was Mr. R.M. Newton on the brief) for appellants.
Mr. Jeremiah M. Wilson and Mr. J.S.C. Blackburn for Brooke Mackall, appellee. Mr. W. Willoughby filed a brief for same.
Mr. Robert Christy and his wife, Mrs. Catharine Christy, appellees in person.
MR. JUSTICE BREWER delivered the opinion of the court.
This is an appeal from a decree of the Supreme Court of the District of Columbia. The facts are these:
On December 9, 1879, Brooke Mackall, Sr., made a will, whereby he gave to his children, other than Brooke Mackall, Jr., all his property, declaring as to said Brooke Mackall, Jr., that "by this my last will and testament I do not give, devise, or bequeath to my son, Brooke Mackall, Jr., any part, parcel or portion of my property whatever, as the said Brooke Mackall, Jr., heretofore received from me many and large advances, and as it would be unjust to my other children hereinbefore named, but I direct Leonard to pay him one *169 dollar." This will was duly probated. On February 27, 1880, he executed and delivered to Brooke Mackall, Jr., a deed conveying many lots in Washington and Georgetown. A few days thereafter, and on March 7, 1880, he died, being at the time about eighty years of age. On February 14, 1882, complainants, devisees under the will, filed their bill, setting forth the will and the deed, and praying a decree, "declaring null and void and of no effect the deed of conveyance executed on the 27th day of February, 1880, by the decedent to the defendant, Brooke Mackall, Jr., and ordering the same to be delivered up to the complainants, and affirming the validity of the will made by the decedent on the 9th day of December, 1879." The gravamen of the bill was undue influence on the part of Brooke Mackall, Jr., in securing the execution of the deed. Upon final hearing, a decree was entered as follows by the general term, in which the case was heard in the first instance: "That the deed of Brooke Mackall, Sr., to the defendant, Brooke Mackall, Jr., of February 27, 1880, described in the bill of complaint, shall, as to lot No. 7, in square 223, at the southwest corner of Fourteenth Street and New York Avenue, in the city of Washington, D.C., and the interest therein described and growing out of the same, operate as a confirmation of the title, legal and equitable, in the said grantee, the defendant, Brooke Mackall, Jr., as to all the parties to this suit, and shall stand as a deed of conveyance for such purposes; but as to the remainder of the property described in said conveyance, not relating to said lot No. 7, in square 223, the said conveyance shall be, and the same is hereby, adjudged and decreed to be inoperative, null and void." From that decree the complainants appealed to this court.
As the bill was to set aside the deed as a whole, as having been obtained through undue influence, the decree is apparently incongruous, in that it declares that the deed be sustained as a confirmation of the title of Brooke Mackall, Jr., to lot No. 7, and void as to the other real estate; for if it were, as charged in the bill, a deed obtained through undue influence, it would seem that it should have been adjudged void in toto, and not sustained in part. It will be observed, however, that *170 Brooke Mackall, Jr., took no appeal; so that the question before us is, not whether there was error in declaring the deed void in part, but whether there was error in declaring it valid in part. Error, if error there was, may have been in either portion of the decree; but the limit of our inquiry is as to whether the deed was valid, and should be confirmed as to lot No. 7. If that part of the decree can be sustained, the incongruity is no matter of concern, for defendants have taken no steps to bring before us the other portion.
Further, in respect to this lot No. 7, it must be observed that the answer alleges that the defendant, Brooke Mackall, Jr., was, and had been for many years, the equitable owner. So, if the deed, as an independent and separate instrument, was valid, or the allegation of Brooke Mackall, Jr., that he was the equitable owner of lot No. 7, is true, any informality in the language of the decree may be disregarded, for in substance it was right. This compels an inquiry not merely into the circumstances surrounding the execution of the deed, but also as to the relations of the parties to this litigation to one another, and to the decedent.
More than twenty years before his death differences arose between Brooke Mackall, Sr., and his wife, which culminated in a decree of divorce. In those differences Brooke Mackall, Jr., sided with his father, the other children with their mother; and a large part of the record before us is made up of a story of those differences, and of the conduct and testimony of the children. No good purpose would be served by parading in this opinion those unpleasant facts, or by attempting to pass judgment in approval or condemnation of the conduct of either. Charity kindly throws a mantle of oblivion over these matters of long ago; and justice requires only notice of the fact that in the separation of parents the children took part, the one with the father, the others with the mother. During the score of years which intervened between this separation and the death of Brooke Mackall, Sr., the defendant, Brooke Mackall, Jr., was his constant companion and friend. This intimacy was unbroken, save in two instances of short duration each, the latter one being in the fall of 1879, during *171 which time the will referred to was executed. That after this temporary estrangement had ceased, he should desire to transfer to this son and constant companion his property, is not only not strange, but most natural and reasonable. It is true the deed was made after his last sickness had commenced; but how natural that during those hours of sickness the relations between himself and his children, during times of trouble and length of years, should present themselves to his mind with exceeding force! It is conceded that up to the time of his sickness he was a strong man, physically and mentally. Such a nature forms strong likes and strong dislikes; and at no time are such likes and dislikes so potent as when the thought of approaching death suggests the last action in respect thereto. That up to and including the time of the execution of this deed he retained his mental faculties in full vigor, unclouded by opiates, the testimony of his physician, his pastor, the justice of the peace before whom the deed was acknowledged, his counsel and his nurse abundantly establishes. Indeed, the contention of counsel on the argument was, not that the grantor was ignorant of the scope and purposes of the deed, or was doing that which he did not intend to do, but rather that the deed thus knowingly and intentionally executed was induced by undue influence; and, in this respect, reference was made to the long intimacy between father and son, the alleged usurpation by the latter of absolute control over the life, habits and property of the former, efforts to prevent others during the last sickness of the father from seeing him, and the subjection of the will of the father to that of the son, manifest in times of health, naturally stronger in hours of sickness. A confidential relation between father and son is thus deduced, which, resembling that between client and attorney, principal and agent, parishioner and priest, compels proof of valuable consideration and bona fides in order to sustain a deed from one to the other. But while the relationships between the two suggest influence, do they prove undue influence? In this respect, we quote from the notes to the case of Small v. Small, 4 Greenl. 220, reported in 16 Am. Dec. 259, as follows:
*172 "Influence gained by kindness and affection will not be regarded as `undue,' if no imposition or fraud be practised, even though it induce the testator to make an unequal and unjust disposition of his property in favor of those who have contributed to his comfort and ministered to his wants, if such disposition is voluntarily made. Matter of Gleespin's Will, 26 N.J. Eq. 523... . Confidential relations existing between the testator and beneficiary do not alone furnish any presumption of undue influence. Lee v. Lee, 71 N.C. 139. Nor does the fact that the testator on his deathbed was surrounded by beneficiaries in his will. Bundy v. McKnight, 48 Indiana, 502... . Nor that the testator, an old and helpless man, made his will in favor of a son who had for years cared for him and attended to his business affairs, his other children having forsaken him. Elliott's Will, 2 J.J. Marsh. 340; S.C. Redf. Am. Cas. on Wills, 434... . It would be a great reproach to the law if, in its jealous watchfulness over the freedom of testamentary disposition, it should deprive age and infirmity of the kindly ministrations of affection, or of the power of rewarding those who bestow them.
"Undue influence must destroy free agency. It is well settled that in order to avoid a will on the ground of undue influence, it must appear that the testator's free agency was destroyed, and that his will was overborne by excessive importunity, imposition or fraud, so that the will does not, in fact, express his wishes as to the disposition of his property, but those of the person exercising the influence."
That the relations between this father and his several children during the score of years preceding his death naturally inclined him towards the one and against the others is evident, and to have been expected. It would have been strange if such a result had not followed; but such partiality towards the one, and influence resulting therefrom, are not only natural, but just and reasonable, and come far short of presenting the undue influence which the law denounces. Right or wrong, it is to be expected that a parent will favor the child who stands by him, and give to him, rather than the *173 others, his property. To defeat a conveyance under those circumstances, something more than the natural influence springing from such relationship must be shown; imposition, fraud, importunity, duress, or something of that nature, must appear; otherwise that disposition of property which accords with the natural inclinations of the human heart must be sustained. So that if this case turned simply upon the question of undue influence, compelling a voluntary conveyance, it would be difficult to find enough in the testimony to overthrow this deed.
But the case does not rest upon this alone. Brooke Mackall, Jr., alleged in his answer that lot seven was equitably his, having been given him years before by his father; and this allegation seems to have been recognized as true by the court below, for it established the deed as a confirmation of his title. It appears that in November, 1851, Brooke Mackall, Sr., purchased the lot, one-half of Key and Dunlop, and the other half of W.W. Corcoran. Neither party at the time made a deed, and from Key and Dunlop the title was only acquired thereafter by a decree in equity. A deed from Corcoran was not obtained until some time in 1865. Prior to this time the father had given the property to the son, and placed him in possession. This fact is proved, not alone by the testimony of the son, or the uncertain recollection of witnesses, but from written statements, which carry no taint of failing memory, and speak the same language one day and another. On October 6, 1865, Mr. Hyde, the agent for Mr. Corcoran, gave a certificate, in which, after mentioning the balance claimed to have been owing, he adds: "This sum has been paid, and Mr. Mackall asks, in lieu of the delivery of the deed as aforesaid to himself, to have the property conveyed to Brooke Mackall, Jr., he being a party to the same." On November 28, 1865, Brooke Mackall, Sr., gave a deposition, which was filed in a case in the Supreme Court of the District of Columbia, in which he stated: "Mr. Corcoran also refused to give me a deed unless I paid him additional for some back taxes, which I refused to do. I never did get a deed until the other day, since his return from Europe. This property *174 I gave my son, Brooke Mackall, Jr., some years ago, and he has had it in possession ever since, and has subdivided them into six lots. There is not a more valuable property in the city, as is the belief of many good judges. He rented the part occupied as a restaurant on the 9th of February, 1863, and has been drawing the rent ever since." There was also filed in the testimony in that case the following letter and relinquishment:
 "WASHINGTON, March 3, 1866.
"Maj. Gen'l MEIGS, Quartermaster General.
"SIR: During the lifetime of Gov. Corwin, I employed him individually in behalf of my son, Brooke Mackall, Jr., of this city, who owns the lot on the corner of New York Avenue and 14th Street, occupied by paymaster-general department, to procure and collect from said department what was due to said Brooke Mackall, Jr., for rent and use of the premises. Since Gov. Corwin's death neither Brooke nor myself, as his agent, has ever recognized any one except Black, Lamon & Co. as attorneys in the premises, as will appear by power of attorney to them from Brooke Mackall, Jr. Mr. Corwin desired me to allow his partner, Judge Johnson, to assist in the claim, but I refused to allow any one but himself to take charge of it, having confidence in him as an old friend.
 "Very respectfully, (Signed) B. MACKALL.
"I hereby relinquish all right to, and authorize Brooke Mackall, Jr., to receive the amount awarded for use of, property on 14th Street and New York Avenue, as it is his.
"Witness: (Signed) B. MACKALL.
"(Signed) L.G. BRANDEBURG.
"22d October, 1865."
On July 12, 1871, Brooke Mackall, Sr., filed an answer under oath in said cause, which was entitled Alfred Richards et al. v. Brooke Mackall et al., in which he alleged "that he purchased said lot and promised to give it to his son, Brooke Mackall, Jr., at some future time, but has not since been in *175 a financial condition to carry out such intention, and has never given him any conveyance of the said lot, nor any paper-writing relating to said lot."
Again, litigation concerning this lot has been twice at least to this court. Mackall v. Richards, 112 U.S. 369; Richards v. Mackall, 124 U.S. 183. In each of these cases the equitable title of Brooke Mackall, Jr., was recognized. We refer to these various statements and decisions not as conclusive against the appellants; but as furnishing a solid foundation upon which to rest the testimony of Brooke Mackall, Jr., that the lot was given to him twenty years before the execution of this deed, possession taken, and improvements made by him. A party who receives a parol gift of real estate, enters into possession and expends money in improvements thereon, presents equitable considerations which will uphold a decree establishing a subsequent conveyance as a confirmation of his equitable title. So that in this respect, also, the ruling of the court below finds abundant support.
Another matter requires notice: The will referred to gives his property to his children other than Brooke Mackall, Jr., and this, notwithstanding the fact that he had made two prior wills, giving his property to Brooke Mackall, Jr. But as explaining this last will, in the second item he says: "I do not give, devise, or bequeath to my son, Brooke Mackall, Jr., any part, parcel or portion of my property whatever, as the said Brooke Mackall, Jr., heretofore received from me many and large advances." While no property is mentioned, yet, reading between the lines, it is evident that the testator recognized the validity of his parol gift of lot 7; and doubtless that was what was meant when he said that Brooke Mackall, Jr., had heretofore received from him large advances. It was his other property which he was giving to his other children; and it would be straining the language of the will to suppose that thereby he intended to ignore his parol gift, and to dispossess this son of that which he had given to him theretofore.
Putting these various matters together, we think that whatever criticism may be made upon the form of the decree, it is substantially right, and therefore it is Affirmed.