## CONLEY *v.* NAILOR & Others.

APPEAL FROM THE SUPREME COURT OF THE DISTRICT OF COLUMBIA.

Argued April 12, 13, 1886.—Decided April 26, 1886.

In equity, each case to set aside a deed for incapacity of the grantor, or intoxication at the time of execution amounting to incapacity, must be decided on its own merits, without regard to previous decisions in cases differing in the facts.

When the complainant in a bill in equity neither demands nor waives an answer under oath, and the respondent answers under oath, the answer is evidence on behalf of the respondent, conclusive if not contradicted.

A deed by a father for the benefit of his illegitimate child is upon a good and sufficient consideration; and if it contains a remainder to the mother of the child, and the child dies in the lifetime of the father, the conveyance is good as against the legitimate children of the grantor.

In order to cause a will or deed to be set aside on the ground of fraud and undue influence, it must be established to the satisfaction of the court that the party making it had no freewill, but stood *in vinculis.*

When a married man, with a wife living, and a family of legitimate children, lives apart from them in illegal intercourse with another woman by whom he has an illegitimate child, and makes a conveyance of real estate for the benefit of that child with remainder to the mother and another conveyance to the mother for her own benefit, and the child dies, and it is not shown that the grantor was incapable of making the deeds, either by reason of the weak state of his intellect, or by reason of intoxication at the time of execution, or that there was fraud or undue influence, a court of equity will, after the death of the grantor, sustain the conveyances in favor of the mother as against the legitimate children.

This was a bill in equity to set aside four deeds under which the appellant, who was defendant below, claimed. The case is stated in the opinion of the court.

*Mr. W. D. Davidge* (*Mr. Irving Williamson* was with him on the brief) for appellant.

*Mr. W. A. Cook* and *Mr. C. C. Cole* for appellees.

Mr. JUSTICE WOODS delivered the opinion of the court.

This was an appeal from a decree of the Supreme Court of the District of Columbia, by which certain deeds executed by

one Allison Nailor to Catharine Conley, the defendant and appellant, were declared null and void. The deeds were four in number, and under them the defendant claimed title to certain real estate, some of which was situate in the city of Washington, and the rest in Montgomery County, in the State of Maryland. The bill was filed by the widow and three of the four heirs of Nailor. The interest of the widow in the lands was as doweress, and her rights were conceded by the answer. Allison Nailor, Jr., the remaining heir, was made a defendant, and answered that he had received his share of his father's estate by advancement, and disclaimed any interest in the property in controversy. The litigation was, therefore, virtually between the appellant and Washington T. Nailor, son, and Lizzie Trimble and Frances Clarke, married daughters of Allison Nailor, whose husbands, Matthew Trimble and James W. Clarke, were joined as plaintiffs.

The pleadings and evidence showed the following facts: In the latter part of the year 1869 Allison Nailor, who was then about fifty-eight or fifty-nine years of age, was the owner of real estate in the City of Washington and in Montgomery County, Maryland, worth about $150,000, and was possessed of considerable personal estate. He had resided in the city of Washington for about fifty years. He had for many years been engaged in buying and selling real estate, in keeping a livery stable, and in farming. He was shrewd and active in business, and had the capacity for making money and accumulating property. Much of the real estate which he owned in the city of Washington he let to be used for houses of ill-fame, and for sale by retail of spirituous liquors. For many years prior to 1869, and at least as early as the year 1854, he had led a dissolute and intemperate life. In 1869 he made the acquaintance of the defendant, who was then about twenty-one years of age. There is no averment or proof that prior to that time she was not a virtuous woman. In November or December of that year Nailor left his family and took up his residence with the defendant, and lived with her in concubinage until his death.

The deeds referred to in the bill were the following: The

first was a trust deed, dated and executed November 27, 1872, more than six years before the death of Nailor, and recorded May 27, 1873, which conveyed to the defendant, Catharine Conley, a lot on South 14th street, in the city of Washington, to hold in trust for the sole and separate use of Willie Earnest Nailor, who is described in the deed as the infant son of the grantor and the grantee. By the terms of the trust the grantee was to receive the rents and profits of the lot and apply the same to the education and support of the beneficiary. When the latter became twenty-one years of age the trust was to cease, and the title in fee simple was to vest in him. But the deed provided that, should "said Willie Earnest die before he arrives at the age of twenty-one years," "or without having disposed of the said piece or parcel of ground," then the title in fee simple should vest absolutely in the defendant.

The three other deeds were all dated and executed March 29th, and recorded early in April, 1878. One of these three deeds conveyed to the defendant certain other real estate in the city of Washington in trust for the sole and separate use of Mary Edna Nailor, who is described as the infant daughter of the grantor and grantee, upon trusts and uses similar to those contained in the first deed, and with a similar remainder to the defendant. The second of the three deeds conveyed to the defendant about one hundred and thirty acres of land in Montgomery County, Maryland, in trust for the benefit of the said Willie Earnest Nailor, upon trusts and uses similar to those contained in the deed of November 27, 1872, and with a similar remainder to the defendant. The last deed conveyed to the defendant, in fee simple, for her own use, about one hundred acres of land in Montgomery County, Maryland. The property conveyed by these four deeds was worth about $25,000. Willie Earnest Nailor died August 6, 1878, being nearly six years of age, and Mary Edna Nailor died August 8, 1878, being nearly two years of age. Catharine Conley, therefore, claimed title in fee simple to all the property conveyed by the four deeds above mentioned. Allison Nailor died January 6, 1879.

The bill alleged three grounds for setting the deeds aside. The first was that the grantor was "demented and insane,"

and mentally incapable of making the deeds; the second, that
the only consideration for said deeds, "and each of them, was
the illegal and criminal intercourse between said Allison Nailor,
senior, and the said Catharine Conley, and that such consider-
ation was illegal, alike contrary to public policy and common
decency;" and the third, that the deeds had been procured by
fraud and the undue influence of the defendant over the
grantor. The bill neither required nor waived an answer
under oath, but the defendant answered under oath, traversing
all the averments of the bill upon which the prayer for relief
was based. We shall notice the grounds upon which the can-
cellation of the deeds is demanded in the order in which we
have stated them.

There is a large mass of evidence in the record introduced to
prove that, from a long course of dissolute and intemperate
habits, Nailor had become insane and incapable of transacting
business. On the other hand there is, in our judgment, a great
preponderance of evidence to show that when he executed the
deeds, though in feeble health, he was of sound mind and cap-
able of intelligently executing and making the conveyances.
It would serve no useful purpose to discuss the evidence in de-
tail. But there are some striking facts which should be stated.
Of the forty-three witnesses for the plaintiffs who testify in re-
gard to the mental capacity of Nailor, thirty-three give their
opinion from having seen him when drunk. Of these thirty-
three eighteen swear that they never saw him sober, three that
they never saw him sober but once, and twelve that they sel-
dom saw him when not intoxicated. Six other of the forty-
three witnesses speak of him as incompetent to transact busi-
ness when he had been drinking. Only four witnesses testify
that he was incapable of doing business when sober. Three of
these are plaintiffs in this case, namely W. T. Nailor, Matthew
Trimble, and James W. Clarke. W. T. Nailor testifies gener-
ally that for the last eight or ten years of his life, Allison
Nailor, his father, was incapable of transacting business, and
that neither on November 27, 1872, when the first deed
was executed, nor on March 29, 1878, when the other three
were executed, was he mentally competent to make a valid

conveyance. But the same witness testifies that during the last
year of his father's life he took from him a thirty years' lease
for certain stables in the city of Washington, at a rent of $50
per month and the taxes on the property. Matthew Trimble
and James W. Clarke both swear generally, the first that for
the last three years, and the other that for the last six or seven
years of his life, Allison Nailor was not competent to transact
such business as the disposition and conveyance of valuable
property. Fairly construed the testimony of these three plain-
tiffs may be considered to mean that, whether inebriated or
not, Nailor was mentally incompetent during the latter years
of his life to attend to business of moment. After Nailor left
his family and went to live with the defendant, it does not ap-
pear that these witnessess had any better opportunities for ob-
serving his mental condition than many others. There is but
one witness, not a plaintiff in the case, who testifies that dur-
ing the time covered by the transactions set out in the bill,
Nailor, if sober, was not mentally capable of making the con-
veyances which the bill seeks to set aside.

The question to be decided is not whether Nailor had the
mental capacity to make the conveyances when he was intoxi-
cated, but whether he was competent when sober, and whether
he was sober when he executed them. On these questions the
evidence does not leave us in doubt. There is abundant testi-
mony to show that during the last six or seven years of his
life, Nailor, though habitually intemperate, was often sober
and free from the influence of intoxicating liquors. This fact
is shown by the testimony of fourteen witnesses who swear
that they had interviews with him, many of them frequently,
during the time above mentioned, and found him entirely
sober. Every one of these fourteen witnesses testifies to the
sanity and capacity of Nailor for the transaction of business.
These witnesses, a number of whom had dealings with him,
assert his mental capacity in the strongest terms. Other wit-
nesses, who did not state distinctly whether they had met him
when not under the influence of drink, spoke of the soundness
of his mind in the same way. Three witnesses testify that
they had known Nailor, one for thirty, and the other two for

forty years, and had seen and talked with him while sober during the last year of his life, and they concurred in the opinion that he was at that time of sound and capable mind.

The proof of Nailor's mental capacity extended to a period after the execution of the last three deeds. The physician who was attending his two children during their last illness, and who had frequent occasion to observe him when not at all under the influence of drink, testified to the soundness of his mind.

The apparent discrepancy between the witnesses for the plaintiffs and the witnesses for the defendant on the question of Nailor's mental condition is, therefore, in a large degree reconciled by the fact that the former give their opinions of Nailor's capacity when drunk and the latter when sober. In view of all the testimony on this branch of the case, it appears that Nailor, for many years before his death, had been dissolute and intemperate, and that during the last seven or eight years of his life his health had gradually failed. Much of the time he was more or less inebriated, but he was frequently entirely sober. When drunk he was, like most other men, incompetent to transact business. When sober he was, down to his last illness, entirely capable of doing the acts which are assailed in this case. He was competent to make deeds, to understand their effect, and to know whether or not their execution would accomplish his wishes. In all conditions, he was perverse, wilful, obstinate, and defiant of public opinion.

The next inquiry relates to Nailor's mental condition and capacity on the two occasions when he executed the deeds whose validity is questioned by the bill. The averment of the bill was that the deeds were made when he was intoxicated and mentally incapable. The charge that Nailor was intoxicated when the deeds were executed is without support in the evidence. So far, therefore, as it concerns the deed executed on November 27, 1872, the case must fail for want of proof, for if Nailor was then competent to make a deed when sober, the plaintiffs to succeed in overthrowing that conveyance must show that when he executed it he was not sober, and this they have not attempted to do. In respect to the three deeds of

March 29, 1878, the proof of sobriety and mental capacity of Nailor when he executed them is positive and satisfactory. The deeds were signed and acknowledged by Nailor before Nicholas Callan, a notary public of Washington city. Callan testifies that he had known Nailor for more than forty years; that he had during that time done much conveyancing for him; that he had taken his acknowledgment to more than a hundred deeds; that Nailor came to his office alone on March 29, 1878, for the purpose of signing and acknowledging the last three deeds in question; that he conversed with him; that his mental condition was good on that day; and that he was sober. The deeds were all prepared beforehand, and were brought by Nailor, who acknowledged them in the presence of the witness.

This evidence is unimpeached and uncontradicted, and is conclusive. Upon the whole record, therefore, in our judgment it plainly appears that Nailor was not intoxicated, and was mentally competent, when he executed the deeds which are the subject of this litigation.

The cases of *Harding* v. *Handy*, 11 Wheat. 103, and *Allore* v. *Jewell*, 94 U. S. 506, are cited by the plaintiffs' counsel as authorities in law against this conclusion. These cases establish the proposition that extreme weakness of intellect, even when not amounting to insanity, in the person executing a conveyance, may be sufficient ground for setting it aside when made upon a nominal or grossly inadequate consideration. Conceding the correctness of this legal proposition, it can have no application to the present case, unless the facts are substantially the same. A cursory reading of the cases will show such a palpable difference in the facts, as to make it clear that they cannot be taken as controlling authority in this. Cases like the present must each stand upon its own facts, and, when the testimony shows that the grantor was sober and capable and well knew what he was doing when he executed the deed, no other case materially differing in its facts can furnish a reason for setting aside the deed thus executed.

The next ground alleged in the bill for annulling the deeds was, that the only consideration for their execution was the

illegal and criminal intercourse between Nailor and the defendant. There is no averment that the deeds were given in consideration of future criminal intercourse. The criminal intercourse averred must, therefore, be construed to mean past intercourse. Without pausing to consider whether or not past criminal intercourse is a sufficient consideration to support a deed, it is enough, upon this branch of the case, to say that the averment is without support by any testimony in the record. On the contrary, the deeds recite a valuable consideration, and the averment of the bill is flatly denied by the answer of the defendant made under oath. The answer, though not called for under oath, is evidence in behalf of the defendant. For, if a plaintiff in equity is unwilling that the answer should be evidence against him, he must expressly waive the oath of the defendant in his bill. See amendment to 41st Equity Rule. If he fails to do this the answer must be given under oath, and is evidence. This branch, therefore, of the plaintiffs' case breaks down, because all the testimony in the record upon the question of consideration is against the averment of the bill.

But it should be noted here that three of the four deeds assailed by the bill were made by Nailor mainly for the benefit of the two children whose father he declared himself to be. The interest of the defendant in the property conveyed was remote and contingent. If the deeds were valid when executed, the subsequent death of the children could not avoid them. It is not now open to question that a deed made by a father for the benefit of his illegitimate child, is upon good consideration, which will support the conveyance. *Gay* v. *Parpart*, 106 U. S. 679; *Bunn* v. *Winthrop*, 1 Johns. Ch. 329; *Hook* v. *Pratt*, 78 N. Y. 371; *Marchioness of Annandale* v. *Harris*, 2 P. Wms. 432; *Jennings* v. *Brown*, 9 M. & W. 496.

The next and last ground alleged for annulling the deeds is that Nailor was induced to make them by the fraud and undue influence of the defendant. The ground upon which courts of equity grant relief in such cases is, that one party by improper means and practices has gained an unconscionable advantage over another. The undue influence for which a will or deed will be annulled must be such as, that the party making it has

no free will, but stands *in vinculis.* "It must amount to force or coercion, destroying free agency." *Stulze* v. *Schaeffle,* 16 Jurist, 909. See also *Williams* v. *Goude,* 1 Hagg. Eccl. 577; *Armstrong* v. *Huddleston,* 1 Moore, P. C. 478. In *Eckert* v. *Flowry,* 43 Penn. St. 46, it was said by Strong, J.: "Now, that is undue influence which amounts to constraint, which substitutes the will of another for that of the testator. It may be either through threats or fraud, but, however exercised, it must, in order to avoid a will, destroy the free agency of the testator at the time when the instrument is made." The rule upon this subject was thus stated in *Davis* v. *Calvert,* 5 Gill & J. 269, 302: "A testator shall enjoy full liberty and freedom in the making of his will and possess the power to withstand all contradiction and control. That degree, therefore, of importunity or undue influence which deprives a testator of his free agency, which is such as he is too weak to resist and will render the instrument not his free and unconstrained act, is sufficient to invalidate it."

Tested by these rules, the charge that the deeds in question were procured by the fraud and undue influence of the defendant is without support. On this branch of the case the plaintiffs have taken pains to prove that the defendant treated Nailor with great kindness and with unremitting attention to his wants and comforts, but they have shown nothing else. There is an absence of proof that the defendant used either threats, stratagem, importunity, or persuasion to induce Nailor to execute the deeds. In fact there is no evidence that the defendant even requested him to make them. On the other hand, the proof is abundant that the making of a provision for the children whom the defendant had borne him had long been his cherished purpose. As early as 1872, soon after the birth of his son Willie, he executed the first deed. In December, 1877, he executed a will for the sole purpose of providing for the two children then living borne him by the defendant, and for the defendant. Afterwards, conceiving that a provision by will was not as secure as one by deed, he executed the deeds in question, in which he made precisely the same disposition of the property that he had previously made by the will. The

proof shows that he took great pleasure in what he had done or what he proposed to do for these children.   It was a matter of which he often boasted to his friends and acquaintances. In short, the evidence that the making of the deeds was his own act, and not the act of another, is clear, and is uncontradicted. Conceding, therefore, as it is contended by plaintiffs' counsel, that when a will or deed is made while the parties are living in illegal sexual relations, it is open to suspicion of fraud and undue influence, the plaintiffs have failed by any testimony whatever to show that the deeds in question were procured by either.   On the contrary, it is shown that the making of the deeds was the result of Nailor's free volition.

As none of the grounds alleged for annulling the deeds have been maintained, the decree of the Supreme Court of the District of Columbia must be

*Reversed, and the cause remanded, with directions to dismiss the bill.*